

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00283-CV

_____

MORGAN MCCOMB, Appellant

V.

JEFFREY LEACH, Appellee

---

On Appeal from County Court at Law No. 2
Parker County, Texas
Trial Court No. CIV-23-0240

---

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Morgan McComb appeals from a final judgment awarding sanctions and attorneys' fees after the trial court dismissed McComb's lawsuit against Appellee Jeffrey Leach pursuant to the Texas Citizens Participation Act (TCPA). In two issues, McComb contends that the trial court abused its discretion by awarding Leach $20,000 in sanctions and $124,158.75 in attorneys' fees. We affirm the trial court's judgment.

### II. BACKGROUND

When the underlying dispute arose, McComb was a member of and canvassing coordinator for the Texas Nationalist Movement (TNM), which supports legislative efforts for Texas to become an independent nation.[1] During the 2023 session of the Texas Legislature, State Representative Bryan Slaton filed HB 3596, which proposed allowing Texans to vote during the next general election "in a referendum on the question of whether this state should reassert its status as an independent nation." Tex. H.B. 3596, 88th Leg., R.S. (2023)

In March 2023, on the social-media platform that was then still known as Twitter, Slaton tweeted that he had filed HB 3596. Leach, also a State Representative, retweeted Slaton's tweet and responded, "This ridiculous bill is the very definition of

---

[1]TNM and others refer to this movement as TEXIT.

hypocritical & seditious treason & it is already dead." Leach also tweeted, "Any legislator who signs on to support this reckless, seditious and treasonous bill will not pass a single bill this session. This isn't a threat. It's a promise." McComb then tweeted Leach: "Are you accusing me of treasonous sedition? A person who is tired of living under the boot of the federal govt. Texans who love this state?" Leach responded, "If you believe that Texas should secede from the United States of American# – then yes. Unequivocally yes."[2]

## A. Initial Suit and Motion to Dismiss

On April 18, 2023, McComb sued Leach for defamation per se,[3] specifically for what she characterized as his "statements published on Twitter that [she] is guilty of 'treasonous sedition' because of her support for HB 3596." McComb alleged that a reasonable person of ordinary intelligence could have read Leach's final tweet as accusing her of committing the federal crimes of seditious conspiracy and treason. She contended that Leach, a lawmaker with knowledge of how to review and apply the definitions of those crimes, made this statement with knowledge of its falsity or with reckless disregard for its falsity. Leach answered with a general denial; he also raised the defenses of "Opinion" and "Consent/Invited Publication."

---

[2]All of these tweets were made on the same day.

[3]McComb filed her Plaintiff's Original Petition on this date. On May 5, 2023, she filed her Plaintiff's Amended Petition, which is substantively the same. We refer to her Plaintiff's Amended Petition, the last live pleading, as the Petition.

On June 16, 2023, Leach filed a Defendant's Motion to Dismiss pursuant to the TCPA. Relying primarily on the Texas Supreme Court's opinion in *Lilith Fund for Reproductive Equity v. Dickson*, Leach argued that McComb could not show a prima facie basis for her defamation claim because his allegedly defamatory tweet did nothing more than assert his opinion that supporting secession is a treasonous act. 662 S.W.3d 355, 369 (Tex. 2023) (holding, in context of political debate concerning abortion, that a person's subjective belief "is not the standard for determining whether a statement of opinion is defamatory" and that "[t]he touchstone is the reasonable reader's reception"). He also argued that McComb was barred from recovering for defamation because she either procured his statement or invited him to make it. Leach attached as exhibits numerous tweets, news stories and articles, and information about TNM and its political advocacy.

McComb filed a response in which she accused Leach of attempting "to stifle" her free-speech right. She did not dispute that the TCPA applied, but she argued that unlike the abortion debate at issue in *Dickson*—the "highly publicized[] and fervent" nature of which "a reasonable reader could not be ignorant"—"reasonably informed persons in today's society are not aware that advocating for Texas secession is not a crime of 'treason or sedition.'" *Id.* at 364.

In August 2023, the trial court held a hearing on Leach's Motion to Dismiss, at which both sides presented argument and the trial court admitted additional, video evidence for the record. Leach relied on *Dickson* as controlling while McComb

4

attempted to distinguish it factually. The day after the hearing, the trial court granted Leach's Motion to Dismiss.

## B. Attorneys' Fees and Sanctions Motions

Three months later, in November 2023, Leach filed a Defendant's Motion for Costs and Fees, seeking "the opportunity to submit evidence of, and for the [c]ourt to award, approximately $90,000 in court costs and reasonable attorney's fees." A footnote in that motion notes, "This motion will be supplemented with evidence of all reasonable attorney's fees and court costs incurred in connection with [McComb's] meritless legal action in advance of or during the hearing." McComb filed a short response, in which she acknowledged that Leach was entitled to attorneys' fees—and admitted that $350 to $400 per hour would be a reasonable hourly rate for a Parker County attorney—but contended that Leach was seeking to punish her for filing the suit by seeking fees for an unreasonable amount of work on the case. McComb asked the trial court to enter an "order limiting the amount of attorneys' fees [that] Leach [would be] allowed to attempt to prove up . . . to a reasonable amount." The trial court did not issue a ruling in response.

In February 2024, Leach filed a separate Defendant's Motion for Sanctions, in which he sought monetary sanctions against both McComb and her counsel—Paul M. Davis—under the TCPA, Chapter 10 of the Texas Civil Practice and Remedies Code, Texas Rule of Civil Procedure 13, and the trial court's inherent authority. Tex. Civ. Prac. & Rem. Code Ann. §§ 10.001–.002, 27.009(a)(2); Tex. R. Civ. P. 13; *Darnell v.*

*Broberg*, 565 S.W.3d 450, 459 (Tex. App.—El Paso 2018, no pet.). Attached to this motion were sixty exhibits, many of which also had been attached to the Motion to Dismiss.

A little over two months after filing his Motion for Sanctions, Leach filed a Defendant's First Amended Motion for Costs and Fees.[4] This motion included a comprehensive affidavit from Eggleston King Davis LLP (EKD) partner Jonathan A. Cone, who performed most of the work on the case for EKD. Attached to Cone's affidavit were EKD's billing records on the case from April 2023 through February 21, 2024, the date the Motion for Sanctions was filed. The total fees requested for 280.75 hours of attorney and paralegal work was $106,871.25.[5]

In his affidavit, Cone (1) provided a detailed list of EKD's services to Leach in this suit, (2) set forth when the services were provided, (3) provided the names and backgrounds of the attorneys and legal assistants who worked on the case for EKD, (4) stated that a reasonable hourly rate for all EKD partners and senior associates working on the case would be $375 per hour (which included a discount for two of the partners' hourly rates), (5) noted that the attached billing records reflected an already-applied discount that "either exclude[d] the task and charges . . . from the

_____

[4]We refer to this First Amended Motion for Costs and Fees—including a later supplement—as Leach's Motion for Fees.

[5]Although Leach had incurred costs of $2,799.70, he did not seek reimbursement for them in his Motion for Fees.

6

invoice entirely (for any duplicate work)[] or otherwise reduc[ed] the time spent on the task," and (6) averred that the work shown in the billing records "reflect[ed] defensive work . . . related solely to defending . . . Leach against [McComb's] meritless defamation claim" with the only arguable exception being that the records did not segregate work on the Motion for Sanctions with respect to the sanctions requested from McComb versus the sanctions requested from her attorney. But according to Cone, these fees were "not capable of being reasonably segregated" because "[t]he basis of" his sanctions motion against both McComb and Davis was that they were both a part of "a planned, premeditated, and coordinated political strategy" of TNM.

In addition to opining about the reasonableness of the lodestar evidence attached to the motion, Cone concluded that the attorneys' fees Leach sought were reasonable based upon the *Arthur Andersen*[6] factors. Finally, he opined about the amount of reasonable and necessary appellate attorneys' fees that would be appropriate.

A hearing on both the Motion for Fees and the Motion for Sanctions was set for May 14, 2024.

McComb filed a single response to both motions. She claimed that she had not brought the suit for an improper purpose but rather that she had a legitimate

---

[6] *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

grievance against Leach for accusing her of committing a crime.[7]  In opposing Leach's

Motion for Fees, she argued that Leach's response to her suit was not proportional,

that the Motion to Dismiss was overly lengthy with "unnecessary and irrelevant"

exhibits, and that the attorneys' fees Leach sought were "excessive and extreme."

McComb attached Davis's affidavit to her response, in which he averred that,

based on his experience as an attorney and having worked on three prior TCPA

matters, an award of $106,871.25 was "patently excessive and extreme" based on "the

low level of complexity of this case" and the fact that plaintiffs have the higher

burden in defending a TCPA dismissal motion.  He also averred that "50 to 70 hours"

of legal work would be "proportional to the complexity of this case" and that a

reasonable attorneys' fees award to Leach would be no more than $26,250.

Leach subsequently filed a supplement to his Motion for Fees.  He attached an

invoice reflecting an additional $9,787.50 in attorneys' fees that EKD had billed since

the last dated invoice attached to the Motion for Fees and up to the date of filing of

the Motion for Fees.[8]  Leach also requested an additional $7,500 for fees that he

anticipated incurring for the following:  (1) Cone's preparing the supplemental

---

[7]She also argued against the part of the Motion for Sanctions seeking relief under Chapter 10, Rule 13, and the trial court's inherent authority.

[8]Three entries are from January 2024 and thus predate the filing of the Motion for Fees.  But these entries had not been included in the initial lodestar evidence and thus did not duplicate prior entries.  The remaining entries are for tasks performed in April 2024, immediately through the date the Motion for Fees was filed.

attorney-expert affidavit; (2) EKD's preparing and filing the supplement; (3) EKD's preparing for and attending the hearing on the Motion for Fees and Motion for Sanctions; and (4) EKD's preparing a proposed final judgment. Although the services listed in (1) and (2) above had already been performed, no invoice was attached to reflect the actual amount of hours worked on those tasks. However, Cone estimated that he would spend approximately eight hours performing all of the listed tasks and that an associate attorney[9] would spend approximately fifteen hours.

After the hearing on the Motion for Fees and the Motion for Sanctions,[10] the trial court signed an order granting both motions, ordering McComb to pay Leach 100% of the amount of fees he had requested—including conditional appellate fees of $143,550[11]—and awarding Leach $50,000 in sanctions, to be paid jointly and severally by McComb and her attorney. McComb filed a premature notice of appeal from the order granting the Motion to Dismiss and from the order granting the Motion for Fees and Motion for Sanctions. *See* Tex. R. App. P. 27.1(a).

---

[9]This associate's time was to be billed at $300 per hour.

[10]The trial court admitted the exhibits attached to both motions into evidence. The trial court also admitted into evidence the exhibits attached to McComb's consolidated response to both motions.

[11]The order broke down the conditional appellate fees as follows: $39,750 for an appeal to this court, an additional $24,000 for the filing of a petition for review in the Texas Supreme Court, an additional $49,875 for briefing on the merits if ordered by the Texas Supreme Court, and an additional $29,925 if Leach were to prevail after oral argument if ordered by the Texas Supreme Court.

## C. Subsequent Proceedings and Judgments

In June 2024, Davis filed a petition in intervention on behalf of his law firm, Paul M. Davis & Associates, P.C. (PMDA), seeking to add TNM as a third-party defendant and alleging that TNM's President, Daniel Miller, had—on behalf of TNM—requested that PMDA represent McComb and file this suit. According to the intervention petition's allegations, Davis was reluctant to file the suit "because of the substantial risk of losing the motion to dismiss," but Miller told Davis that TNM "would pay all of . . . McComb's legal fees if PMDA agreed to represent her in suing Leach for defamation in addition to all fees and sanctions to which Leach would be entitled in the event of a successful motion to dismiss under the TCPA." PMDA alleged that Miller had told Davis that TNM was "willing to bear the risk of losing in the trial court because it was immensely important to TNM's advocacy for the Texit bill to establish that it is not, in fact, treason or sedition to advocate for Texas independence." PMDA also alleged that Davis had verified with McComb that "TNM had indeed agreed to indemnify her by paying all of her attorney's fees in the case and any fees and sanctions owed to Leach in the event that Leach prevailed on a TCPA motion." PMDA sought a declaratory judgment that, among other things, TNM was "obligated . . . to pay all attorneys' fees, costs, and sanctions awarded to Leach in th[e] lawsuit." It also sought damages for TNM's alleged breach of contract and fraud.

In response, Leach moved to strike PMDA's intervention petition or sever it from McComb's suit. The same day, Leach also filed a motion for the trial court to enter a final judgment on McComb's claims. The next day, the trial court signed a Final Judgment dismissing McComb's suit with prejudice; awarding Leach $124,158.75 in attorneys' fees; awarding Leach $50,000 in sanctions from McComb and Davis—jointly and severally; and awarding Leach $143,550 in conditional appellate fees. The judgment included fifteen pages of findings of fact and conclusions of law supporting the sanctions award. PMDA then moved to nonsuit its petition in intervention, and the trial court signed an order dismissing with prejudice PMDA's claims against TNM.

After the trial court signed the Final Judgment, McComb amended her notice of appeal and filed a Statement of Inability to Afford Payment of Court Costs or an Appeal Bond. She also filed a motion for new trial, in which she again challenged the amount of attorneys' fees and sanctions as excessive. McComb alleged that in awarding such an excessive amount, the trial court had conspired with Leach to violate her First and Eighth Amendment rights.

Before a hearing was set on McComb's motion for new trial, the trial court signed an Amended Final Judgment, which added recitals about and expressly dismissed PMDA's intervention petition. This amended judgment also added findings of fact about events that had occurred after the trial court signed the Final Judgment: (1) that after the trial court signed the dismissal order, "Miller and other

11

TNM members made additional statements pointing to this lawsuit and suggesting that other secession opponents might nevertheless be sued for defamation for making statements similar to the ones at issue in this lawsuit" and (2) that "TNM's members had been very generous in donating toward" the effort to fund McComb's suit.

The Parker County District Clerk contested McComb's claim of indigency. A hearing was set on both the contest and McComb's motion for new trial for July 23, 2024.[12] After an evidentiary hearing, the trial court sustained the District Clerk's challenge to McComb's affidavit of indigency and ordered that McComb pay all costs of her appeal.[13] The trial court also denied McComb's motion for new trial.

After ruling on the motion for new trial and the indigency contest, the trial court signed a Second Amended Final Judgment. The Second Amended Final Judgment did not change the attorneys' fees award or findings, but it modified the sanctions to award Leach $20,000 from McComb individually and $20,000 from Davis individually. It is from this Second Amended Final Judgment that McComb

---

[12]After this hearing was set, Davis filed a petition in intervention on his own behalf. He accused Leach of interfering with his constitutional rights by seeking sanctions, and he accused the trial court of the same by imposing them. Pursuant to 42 U.S.C.A. § 1983, Davis sought at least $1,000,000 in damages from Leach and a permanent injunction restraining Leach "from ever attempting to collect the $50,000 of sanctions from Davis." Additionally, Davis filed a federal suit against Leach, Leach's attorneys and their law firm, the trial court judge, and the District Clerk. Davis attempted to have his intervention petition served at the courthouse on the day of the new-trial hearing. It is unclear from the record whether Davis ever effected service of either his personal petition in intervention or his federal suit.

[13]We denied McComb's appeal of this ruling. *See* Tex. R. Civ. P. 145(g).

12

appeals, challenging only the $20,000 sanctions award against her and the $124,158.75 attorneys' fees award.[14]

## III. DISCUSSION

In two issues, McComb contends that the trial court erred by awarding Leach $20,000 in sanctions and $124,158.75 in attorneys' fees. We first address her sanctions challenge.

### A. Sanctions Award

The trial court gave three bases for its sanctions award: the TCPA, Chapter 10 of the Texas Civil Practice and Remedies Code, and Rule 13 of the Texas Rules of Civil Procedure. We first examine whether the sanctions order was proper under the TCPA. *See generally Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). *Cf. 1st & Trinity Super Majority, LLC v. Milligan*, 657 S.W.3d 349, 377 & n.9 (Tex. App.—El Paso 2022, no pet.) (noting that even if trial court did not have authority to award attorney's fees under Chapter 10 or Rule 13, it did have the authority to do so pursuant to the TCPA and Rule 91a.7); *Nunu v. Risk*, 612 S.W.3d 645, 662 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (affirming attorney's fees award based on multiple grounds when appellant did not challenge all grounds); *Kamel v. AdvoCare Int'l, L.P.*, No. 05-16-00433-CV, 2017 WL 1149669, at *6 (Tex. App.—Dallas Mar. 28,

---

[14]McComb does not challenge the propriety of dismissal of her claims under the TCPA. Davis did not file a notice of appeal challenging the $20,000 sanctions judgment against him. *See* Tex. R. App. P. 25.1(c).

13

2017, no pet.) (mem. op.) (declining to address whether sanctions were appropriate under Rule 13 when affirming them under Chapter 10).

### 1. Applicable Law

A trial court that dismisses a legal action under the TCPA "may award to the moving party sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in [Chapter 27]." Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(2). The trial court has discretion whether to impose such sanctions and to determine the amount that is sufficient to achieve this goal. *See Landry's, Inc. v. Animal Legal Defense*, 631 S.W.3d 40, 46 (Tex. 2021); *Galleria 2425 Owners, Inc. v. Drinnon*, No. 14-24-00204-CV, 2025 WL 1109447, at *3 (Tex. App.—Houston [14th Dist.] Apr. 15, 2025, no pet.) (mem. op.); *Rich v. Range Res. Corp.*, 535 S.W.3d 610, 613–14 (Tex. App.—Fort Worth 2017, pet. denied). In determining whether the trial court abused its discretion, we consider whether the facts present an appropriate case for the trial court's action and whether the trial judge acted arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We may not conclude that the trial court abused its discretion merely because we might have decided a factual question differently from the trial court. *Id.* at 242.

TCPA Section 27.009(a)(2) "does not specify a particular formula, amount, or guideline for determining the sanctions amount other than to say that the amount is

14

to be sufficient to deter the party who brought the legal action from bringing similar actions."[15]  *Tatum v. Hersh*, 559 S.W.3d 581, 587 (Tex. App.—Dallas 2018, no pet.); *see Pisharodi*, 622 S.W.3d at 90 ("The only evidentiary consideration mandated by statute is that evidence be brought for the court to determine an amount 'sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.'").  In assessing sanctions under the TCPA, the trial court can consider the history of the litigation itself.  *1st & Trinity Super Majority*, 657 S.W.3d at 380; *Johnson-Todd v. Morgan*, No. 09-17-00168-CV, 2018 WL 6684562, at *7 (Tex. App.—

---

[15]Although McComb argues that the trial court should have taken her income into account when setting the sanctions amount, the trial court was not required to do so even if it had believed McComb's evidence in support of her indigency claim—which it did not.  *See Pisharodi v. Columbia Valley Healthcare Sys., L.P.*, 622 S.W.3d 74, 90 (Tex. App.—Corpus Christi–Edinburg 2020, no pet.); *cf. Berry v. Bay, Ltd.*, 643 S.W.3d 424, 440 (Tex. App.—Corpus Christi–Edinburg 2022, no pet.) (considering nonexclusive factors used to determine whether sanctions are excessive under Chapter 10, which include the offender's ability to pay, in reviewing whether trial court should have imposed TCPA sanctions in a greater amount and determining that although the factors might have supported a higher sanction, they did not mandate one); *McGibney v. Rauhauser*, 549 S.W.3d 816, 835–36 (Tex. App.—Fort Worth 2018, pet. denied) (considering sanctioned party's almost-zero net worth in light of $150,000 sanctions award supported by only meager evidence—but not mandating consideration of net worth in determining sanctions amount).  McComb also relies on *American Heritage Capital, LP v. Gonzalez* for the proposition that four factors are relevant to the assessment of TCPA sanctions:  (1) the plaintiff's annual net profits; (2) the amount of attorney's fees incurred; (3) the plaintiff's history of filing similar suits; and (4) any aggravating misconduct.  436 S.W.3d 865, 881 ("Tex. App.—Dallas 2014, no pet.) (noting facts relevant to these four topics without articulating a four-factor test), *disapproved of on other grounds by Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017); *see ADB Int., LLC v. Wallace*, 606 S.W.3d 413, 443 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (listing the enumerated topics as "[f]actors" and citing *American Heritage*).  But even if these four considerations are relevant, they are not necessarily outcome determinative.  *See 1st & Trinity Super Majority*, 657 S.W.3d at 380.

Beaumont Dec. 20, 2018, pet. denied) (mem. op.); *Kinney v. BCG Att'y Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *12 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.). The sanctions award must be large enough to serve the purpose of deterrence, but the mere fact that an award is large does not render it excessive. *Baukus v. Engle*, No. 14-22-00705-CV, 2025 WL 924570, at *16 (Tex. App.—Houston [14th Dist.] Mar. 27, 2025, no pet. h.) (mem. op.). Additionally, the TCPA "does not expressly require the trial court to explain how it reached its determination." *Kinney*, 2014 WL 1432012, at *11; *see Mishkoff v. Garrett*, No. 05-22-01063-CV, 2024 WL 770142, at *6 (Tex. App.—Dallas Feb. 26, 2024, pet. denied) (mem. op.) (explaining that findings required by TCPA Section 27.007 when trial court imposes sanctions according to Section 27.009(b) are not required when trial court awards sanctions according to Section 27.009(a)(2)).

## 2. Application

Leach's overall theme in seeking sanctions was that McComb's primary motivation for suing him was not to prevail on the merits of a claim but to attempt to get Leach to publicly admit that his tweet linking TEXIT support to treason and sedition was mere rhetoric.[16] In arguing his Motion for Sanctions, Leach noted that McComb was a perceived political rival and that her suit "encompasse[d] matters that

---

[16]McComb admits as much in her brief: "Appellant's purpose in this case was simply to clarify to the public that her TEXIT advocacy does not constitute the crimes of treason and sedition."

were directly before the legislature at the time that th[e] conduct was occurring." He also pointed to the fact that McComb's process server had "disrupted a major legislative function by appearing to testify on a bill[] and then serving . . . Leach . . . during his role as a chairman of the legislative committee." And Leach produced evidence that in later tweets, McComb had stated, "At least I had the guts to stand up to little Jeffy," and "[H]e admitted what we wanted anyway."[17]

Leach also relied on evidence of McComb's ties to and support from TNM.[18] In July 2022, before Leach and McComb had exchanged the tweets at issue—and before McComb had filed suit—TNM published an article on its website entitled, "Should TEXIT Supporters Sue Opposers Who Accuse Us of Treason?" That article advocated the position that making statements such as Leach's amounted to defamation per se and concluded, "How interesting would it be for lawsuits to be filed against these false accusers by each and every person in the TNM being falsely accused of the crimes of treason and sedition?"

---

[17]Leach provided evidence that in a podcast with Miller while the suit was pending (and before the trial court had granted Leach's Motion to Dismiss), Davis had stated, "[W]e just want to establish that it is not a crime to support this bill because that is one way that politicians have consistently demonized the Texit Movement . . . . And so, we're just going to start suing people that want to accuse Texit supporters of treason or sedition."

[18]McComb relies on the fact that she no longer works for TNM and that it "reneged on its agreement to indemnify her." But the trial court expressly found that McComb's indigency evidence was self-serving, conclusory, and not credible. It also found that TNM's members had "been very generous in donating toward" funding "this litigation."

Leach also attached a transcript of a YouTube video that Miller had made while the suit was pending (and before the trial court granted Leach's dismissal motion), in which Miller stated that although this suit was the first of its kind, "as an organization, we have made a commitment that we're going to fight these things."[19] In the same recording, Miller declared, "[T]his may be the first suit of its kind, . . . but . . . I guarantee you it won't be the last . . . ." Miller went on to solicit funds for legal expenses, primarily for a then-pending suit against Facebook but also for "all those other things." Miller again asked for lawsuit-cost donations in a later podcast and indicated that TNM had financially supported McComb in filing this suit: "These lawsuits cost the TNM money. . . . The TNM provided legal support, legal services, and attorney's fees for . . . McComb in this lawsuit."[20]

After the trial court granted Leach's dismissal motion, TNM tweeted, "Jeff Leach has admitted that he doesn't truly believe that TEXIT supporters are traitors

_____

[19]The Second Amended Judgment includes findings that (1) although TNM's political opponents had previously linked its views with treason and sedition, "before this lawsuit, neither TNM, nor Miller, nor any of TNM's members had ever brought a defamation suit against anyone for making such statements" and (2) "[b]efore this lawsuit and after, TNM, Miller, TNM's members, and [Davis] made statements demonstrating that they regarded statements linking secession with treason and sedition as hyperbole, a form of nondefamatory speech."

[20]Many of the findings in the Second Amended Judgment related to the trial court's factual determination that TNM had agreed to fund the entire suit, including attorneys' fees and sanctions, to further its political objectives.

18

and seditionists. It only took a lawsuit to bring him to his senses, but we're glad it finally happened."

Given (1) the broad discretion provided by the TCPA; (2) the evidence from which the trial court could have concluded that the purpose of the lawsuit was not to recover damages or prevail upon the merits but rather—in furtherance of a political strategy—to force Leach to publicly admit that his tweeted comments were merely statements of his opinion; and (3) the evidence that McComb was aligned with TNM, that TNM had agreed at the outset to fund her suit and indemnify her for any sanctions or attorneys' fees she incurred, and that Miller had publicly stated that TNM would continue to encourage such suits,[21] we cannot conclude that the trial court abused its discretion by awarding Leach $20,000 in sanctions from McComb for the purpose of deterring future similar suits. *See Cobb Dev. v. McCabe*, No. 03-21-00524-CV, 2023 WL 4003513, at *13 (Tex. App.—Austin June 15, 2023, pet. denied) (mem. op.) (noting that trial court could consider history of litigation and that sanctions amount awarded was less than half the attorney's fees awarded); *Cardio Grp., LLC v. Kring*, No. 05-22-00101-CV, 2022 WL 17817971, at *7–8 (Tex. App.—Dallas Dec. 20, 2022, no pet.) (mem. op.) (noting that trial judge could take into account litigation's

---

[21]The Second Amended Judgment includes a finding that TNM's agreement to indemnify McComb led her to believe that she "would not personally incur any consequences for" the suit; thus, her "knowledge *of the TCPA's* statutory consequences for bringing meritless legal actions has been an insufficient impediment to [her] desire and willingness" to bring such a suit. [Emphasis added.]

19

history in determining an amount that would deter future similar suits); *1st & Trinity Super Majority*, 657 S.W.3d at 379 (considering actions of sanctioned party's predecessors-in-interest in determining propriety of TCPA sanctions).[22]

We overrule McComb's first issue.[23]

## B. Attorneys' Fees

In her second issue, McComb contends that the trial court abused its discretion by awarding excessive and punitive attorneys' fees.[24]

### 1. Standard of Review and Applicable Law

A trial court that dismisses a suit according to the TCPA "shall award to the moving party court costs and reasonable attorney's fees incurred in defending against the legal action." Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(1). A "reasonable" attorney's fee under the TCPA "is one that is not excessive or extreme, but rather moderate or fair." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). Whether

---

[22]Leach had also contended that sanctions against McComb were warranted because after she filed this suit, she sued another "political rival" for making allegedly defamatory statements about her on social media. Although McComb challenges the relevance of this suit to the sanctions issue, we need not consider it in light of the other evidence indicating that the trial court did not abuse its discretion.

[23]Because we uphold the sanctions under the TCPA, we need not address the other grounds upon which the sanctions could have been based. *See* Tex. R. App. P. 47.1.

[24]McComb challenges only the $124,158.75 awarded for trial attorneys' fees; she does not challenge the award of conditional appellate fees.

attorneys' fees are reasonable is a fact question "within the court's sound discretion." *Id.* But that discretion does not include "considerations of justice and equity." *Id.*

In reviewing a trial court's attorneys' fees award according to the TCPA, we are guided by the principles set forth in the Texas Supreme Court's opinion in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019). *See generally Mignogna v. Funimation Prods., LLC*, No. 02-19-00394-CV, 2022 WL 3486234, at *16–28 (Tex. App.—Fort Worth Aug. 18, 2022, pet. denied) (mem. op.) (relying on *Rohrmoos* in reviewing trial court's determination of reasonable attorney's fees in TCPA case). To determine a reasonable amount of attorney's fees under *Rohrmoos*, *the factfinder* must start by determining the reasonable hours worked multiplied by a reasonable hourly rate (the "lodestar analysis"); the fee claimant bears the burden of providing sufficient evidence of both. 578 S.W.3d at 498; *Mignogna*, 2022 WL 3486234, at *17; *see El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012) (explaining that the trial court calculates the base lodestar amount). Sufficient evidence must address, at a minimum, (1) the particular services performed; (2) who performed those services; (3) approximately when the services were performed; (4) the reasonable amount of time required to perform the services; and (5) the reasonable hourly rate for each person performing the services. *Rohrmoos*, 578 S.W.3d at 498, 502.

"[T]here is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees that can be

shifted to the non-prevailing party." *Id.* at 499. Most *Arthur Andersen* factors—"the time and labor required"; "the novelty and difficulty of the questions involved"; "the skill required to perform the legal service properly"; "the fee customarily charged in the locality for similar legal services"; "the amount involved"; "the experience, reputation, and ability of the lawyer or lawyers performing the services"; "whether the fee is fixed or contingent on results obtained"; "the uncertainty of collection before the legal services have been rendered"; and "results obtained"—are already incorporated into the base lodestar. *Id.* at 500. "[A] fee opponent [who] seeks a reduction [from the base lodestar amount], . . . bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure." *Id.* at 501.

Even if a fee claimant's testimony is uncontroverted, a trial court is not obligated to award the requested amount. *Mignogna*, 2022 WL 3486234, at *17; *Iola Barker v. Hurst*, 632 S.W.3d 175, 193 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (citing *Smith v. Patrick W.Y. Tam Tr.*, 296 S.W.3d 545, 547–48 (Tex. 2009)). Attorney's fees may be proven as a matter of law in some cases by uncontroverted expert testimony if that testimony is (1) readily controvertible if untrue; (2) clear, direct, and positive; and (3) uncontradicted by the "attendant circumstances." *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990); *Mignogna*, 2022 WL 3486234, at *17. "[A]ttendant circumstances" are those indicating that the claimed attorney's fees are unreasonable or incredible. *Mignogna*, 2022 WL 3486234, at *17. In other

22

words, the particular circumstances of the case inform the reasonableness determination, and the attorney's fees ultimately awarded must bear some reasonable relationship to the amount in controversy. *Id.* (citing *Iola Barker*, 632 S.W.3d at 193). Thus, when determining an appropriate fee award, the trial court is entitled to examine the entire record and to view the matter in light of the amount in controversy, the nature of the case, and his or her personal experience as a lawyer or judge. *Mignogna*, 2022 WL 3486234, at *17 (citing *Iola Barker*, 632 S.W.3d at 193–94).

### 2. Application

Here, McComb does not challenge the reasonableness of the hourly fees charged. In fact, she indicated in her response to Leach's Motion for Fees that "a reasonable partner/associate split would likely yield an effective reasonable rate of $350 to $400 per hour in Parker County." In its lodestar evidence, EKD used $375 as its hourly rate for partners[25] and for a "Senior Attorney" who worked on the case, $300 as its hourly rate for an associate,[26] and $150 as its hourly rate for legal assistants. Cone averred that—according to his experience "performing legal services in North

---

[25]Cone noted that one of the partners' hourly rates had been reduced by $200 and another's had been reduced by $125 per hour.

[26]EKD billed time for another associate who worked on the case at $375 per hour, but Cone explained in his affidavit that the rate for that associate was reasonable "even though it exceeds by $50 per hour the" $285 to $325 per hour range that Cone had stated was reasonable for an associate because this attorney had "performed extremely limited services in this matter (only 0.75 hrs), and the $50 per hour excess . . . was more than mitigated by the $200 and $125 per hour reductions in [the two partners'] rates."

23

Texas since 2012," familiarity with the usual and customary hourly rates for similar services, and consideration of the *Arthur Andersen* factors—the attorney and paralegal hourly rates charged were reasonable. According to Cone's affidavit, the billing records attached to the Motion for Fees reflected already-applied discounts.

McComb has not alleged that Leach's lodestar evidence itself is defective or insufficient.[27] And McComb did not expressly seek a reduction from the lodestar.[28] Her sole argument on appeal is that EKD's total hours worked was excessive in light of her characterization of the suit as involving "two relatively simple legal issues" that did not require extensive legal research. *See Rohrmoos*, 578 S.W.3d at 501 ("[I]f a fee opponent seeks a reduction [from the lodestar], it bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure."). According to McComb, those two issues were "(1) whether a reasonable person would perceive Leach's statements accusing McComb of 'treasonous sedition' to be a statement of fact or of opinion and (2) whether McComb could be held to have invited or procured Leach's statement because she knew he would make it." She argues that "[t]he first standard was entirely set forth in the *Dickson* case" and that the second "was a simple question of whether [she] knew [Leach] would defame her when

---

[27]Leach's attorneys' fees evidence does not suffer from the same generality problem as the attorneys' fees evidence in *El Apple*, 370 S.W.3d at 759, 762–63, and *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014).

[28]Likewise, EKD did not seek for the trial court to award additional fees over the lodestar amount. *See Rohrmoos*, 578 S.W.3d at 500–01.

24

she made her inquiry." In his attorneys' fees affidavit, Davis averred that "Leach's response [to the suit] has the appearance of a bad faith intent to financially punish [McComb] rather than an effort to mount a reasonable defense."

Here, despite McComb's assertions that the legal issue was relatively simple and resolvable solely by referencing the *Dickson* case, *Dickson* involved a different, although no less contentious, political debate—as McComb herself consistently argued in the trial court. Thus, to respond to McComb's attempt to factually distinguish the political debate described in *Dickson* from Leach's statement to McComb, Leach provided contextual evidence of the nature of the TEXIT debate and the types of opinions advanced—both online and in print—during that debate by both parties. As Cone explained in his attorneys' fees affidavit, that task involved "identifying, reviewing, analyzing, and preserving a voluminous amount of social media postings, website pages, news articles, online videos, online audio, and other [i]nternet materials," as well as "the topics of secession, treason, and sedition."

Cone's affidavit detailed how establishing the defensive strategy that the Texas Supreme Court's *Dickson* opinion should control required extensive time and labor from EKD:

> 49. First, as set out above, we were required to dedicate a significant amount of time to research, analysis, and strategy because of the novelties and difficulties described above.[29]

---

[29]Cone had previously described those "novelties and difficulties" as (1) the fact that the then-largely untested 2019 amendments to the TCPA applied to the suit and (2) that the *Dickson* opinion utilized "a robust contextual analysis that relied on

50.  Second, we were required to dedicate significant time to identifying, preserving, organizing, and compiling the evidence needed to conclusively prove . . . Leach's defenses in this case.  Specifically, the contextual evidence relevant to determining how the "reasonable reader" would interpret the tweet underlying [McComb's] claim was extremely important.  Our strategy in that regard was to hew closely to the supreme court's multifactor analysis in *Dickson*, which we concluded was controlling.

51.  In *Dickson*, the supreme court engaged in a broad and robust multifactored analysis that looked to evidence regarding (a) the history of society's debate about the political issue in question; (b) whether the allegedly defamatory statement expresses a common objection to one side's position on that issue; (c) whether the statement reflects an opinion about morality, society, and the law; (d) whether the terms reflected in the statement are used in other areas of public discourse; (e) whether the full text of the statement and the responses to it reveal the speaker was engaged in political advocacy or political debate; and (f) whether the speaker has said anything to falsely indicate the plaintiff has been convicted of a crime based on specific conduct.

52.  To execute our defensive strategy, we not only had to present *some* evidence relevant to these factors; we had to produce *conclusive* evidence. But because *Dickson* was decided less than two months before the [l]awsuit was filed, through the early stages of drafting . . . Leach's Motion to Dismiss, we did not identify any other cases discussing or applying *Dickson*'s analytical framework that could guide our efforts. And while the Austin Court of Appeals' decision in *O'Rourke*[ *v. Warren*, 673 S.W.3d 671 (Tex. App.—Austin 2023, pet. denied)] ultimately provided some guidance in that regard, the court did not decide that case until we were already well into the drafting stage of . . . Leach's Motion to Dismiss.

53.  Additionally, because much of the evidence relevant to . . . Leach's defenses was published only on the [i]nternet, there was considerable

[i]nternet materials no party had presented in the trial court or in their appellate briefing."

concern that evidence could be deleted, removed, or otherwise made unavailable if it was not preserved in permanent form. . . .

. . . .

56.	Thus, because of the risk that the [i]nternet-based evidence supporting . . . Leach's Motion to Dismiss and Motion for Sanctions could become unavailable at any time without warning, we could not rely on merely providing hyperlinks to that evidence in our Motion to Dismiss or Motion for Sanctions. Rather, we were required to expend considerable time and labor identifying, permanently preserving, and authenticating a large amount of [i]nternet materials related to such things as the history of the secession debate from the Founding to the present, as well as the backgrounds and social media postings of numerous individuals and entities. These efforts ultimately culminated in our preparation of an Appendix in support of . . . Leach's Motion to Dismiss that consisted of 93 exhibits totaling 529 pages, and an Appendix in support of his Motion for Sanctions that consisted of 62 exhibits totaling 233 pages.

Thus, the trial court had before it conflicting evidence regarding whether the hours-worked component of the lodestar calculation was reasonable in light of the record as a whole—Davis's opinion of the maximum reasonable hours that EKD should have billed versus Cone's opinion of the total reasonable hours based on the lodestar evidence, as well as the attorneys' different assessments of the case's complexity. As factfinder, the trial court was entitled to resolve this conflict in Leach's favor. *See, e.g.*, *Tite Water Energy, LLC v. Wild Willy's Welding LLC*, No. 01-22-00158-CV, 2023 WL 5615816, at *4, *12 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. denied) (mem. op.); *Cobb Dev.*, 2023 WL 4003513, at *13. And, as Leach has pointed out, trial courts have awarded defendants attorneys' fees in similar amounts upon dismissing TCPA claims. *See Centurion Logistics LLC v. Brenner*, No. 05-

27

23-00578-CV, 2024 WL 5244618, at *19–21 (Tex. App.—Dallas Apr. 11, 2025, pet. denied) (mem. op.) (upholding attorney's fees award of $179,855.57 when evidence provided "a detailed explanation of the segregation of fees attributable to the dismissed claims" and controverting opinion challenging method of segregation was not supported by records themselves); *Broder v. Nexstar Broadcast Grp.*, No. 03-19-00484-CV, 2021 WL 2273470, at *14–17 (Tex. App.—Austin June 4, 2021, no pet.) (mem. op.) (affirming $119,752 attorney's fees award in TCPA case involving five claims, two of which were defamation); *ADB Int.*, 606 S.W.3d at 442–43 (affirming award of full amount of attorney's fees when controverting evidence made clear that reasonableness could be discerned from billing records).[30]

McComb cites this court's opinion in *McGibney v. Rauhauser*, in which we noted that the trial court in that case had "awarded 100% of the amount that Appellee sought" and that in properly exercising its discretion in determining a proper attorney's fees amount, a trial court must "do more than simply act as a rubber-stamp, accepting carte blanche the amount appearing on the bill." 549 S.W.3d at 821. While true, this observation does not mean that a trial court always abuses its discretion by

_____

[30]Two TCPA attorney's fees cases cited by McComb—with much lower attorney's fees awards—do not support her argument that EKD's evidence of hours worked was unreasonably high because those cases involved the appellate court's review of the trial court's decision to award fees much lower than the claimant had sought. *See Berry*, 643 S.W.3d at 434; *Urquhart v. Calkins*, No. 01-17-00256-CV, 2018 WL 3352919, at *2–3 (Tex. App.—Houston [1st Dist.] July 10, 2018, pet. denied) (mem. op.). Thus, they do not stand for the proposition that such fees are necessarily appropriate comparatively for other TCPA cases.

awarding the total amount of attorney's fees requested by a litigant; rather, the record must contain sufficient evidence that the total amount of requested fees is reasonable. *See Toledo v. KBMT Operating Co., LLC*, 581 S.W.3d 324, 330 (Tex. App.—Beaumont 2019, pet. denied); *see also Isomeric Indus., Inc. v. Triple Crown Res., LLC*, No. 01-22-00768-CV, 2023 WL 6884172, at *7 (Tex. App.—Houston [1st Dist.] Oct. 19, 2023, no pet.) (mem. op.) (distinguishing *McGibney* factually); *Day v. Fed'n of State Med. Bds. of the U.S., Inc.*, 579 S.W.3d 810, 827 (Tex. App.—San Antonio 2019, pet. denied) (same); *Bruce v. Bruce*, No. 03-17-00672-CV, 2018 WL 2653550, at *4 (Tex. App.—Austin June 5, 2018, no pet.) (mem. op.) (holding that record supported award of attorney's fees for full amount requested).

Moreover, the facts in *McGibney* are distinguishable. In that case, the total attorney's fees sought and awarded was $300,838.84, but (1) some time entries provided in the lodestar evidence "were so heavily redacted that the trial court could not possibly have had sufficient evidence to determine that the entire amount requested was 'not excessive or extreme, but rather moderate or fair,'" and (2) "[o]ther entries ha[d] dubious relevance to" the suit. 549 S.W.3d at 821–24. Additionally, the lodestar evidence revealed a pattern of billing for unnecessary or excessive work. *Id.* at 824–25. More importantly, the appellee "was never served . . . and, thus, was never under any compunction to appear in the lawsuit whatsoever." *Id.* at 824. Appellants nonsuited the suit "[j]ust a few hours after" the motion to dismiss was filed. *Id.* at 824–25. Thus, in *McGibney*, it was evident from the defects in the lodestar evidence

that the trial court had not engaged in the level of scrutiny of the attorney's fees evidence that *Rohrmoos* requires. *See id.* at 826; *see also Rohrmoos*, 578 S.W.3d at 498–99 (describing importance of lodestar evidence).

Here, the lodestar evidence was sufficiently detailed and did not show a pattern of duplicative, unnecessary, or excessive work.[31] And although only minimal discovery was conducted, EKD did not bill very much for the discovery that was done.[32] Thus, the evidence supporting the attorneys' fees award in this case is distinguishable from the evidence in *McGibney*.

We conclude that, in light of the entire record, the evidence in support of the $124,158.75 attorneys' fees award was sufficient to show that the total amount of

---

[31]We note that three entries—one on July 17, 2023, another on October 1, 2023, and the last on October 2, 2023—are redacted to the point that it is impossible to discern specifically what they pertained to—these totaled 5.15 hours of associate attorney work, for a total of $1,931.25. But it is possible to discern their purpose in context. The October 1 entry states, "Review and analyze bringing [rest of entry redacted]," and the October 2 entry references researching "case law and Texas Rule of Civil Procedure 63 regarding adding [redacted]." Thus, in context, these entries appear to relate to the possible amendment of, or response to, pleadings. *See generally* Tex. R. Civ. P. 63. And the July 17 entry, which stated, "Conference with Whit Davis and Jonathan Cone; p[er]form preliminary research on [redacted]," was in the midst of Cone's work on the Motion to Dismiss. *See Isomeric Indus., Inc.*, 2023 WL 6884712, at *6 (holding that trial court could have filled in the gaps from the redactions in billing records with its knowledge of work necessary to file counterclaim and summary judgment motion). In any event, McComb did not complain about these entries in the trial court, nor has she complained about them on appeal.

[32]Each party served disclosures on the other, and an EKD legal assistant prepared responses to "Plaintiff's Interrogatories and Requests for Admission." Only time for this last response was included in EKD's billing records. EKD billed $135 for this legal assistant's time.

hours worked was reasonable rather than excessive or extreme. *See Rohrmoos*, 578 S.W.3d at 497–502; *Cobb Dev.*, 2023 WL 4003513, at *12 (affirming trial court's attorney's fees award according to *Rohrmoos* and in light of entire record); *Broder*, 2021 WL 2273470, at *17–18 (same). Accordingly, we hold that the trial court did not abuse its discretion by awarding the total amount of fees requested. We overrule McComb's second issue.

## IV. CONCLUSION

Having overruled McComb's two issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: July 17, 2025

31